IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

MAYRA MELENDEZ-MORALES,

       Plaintiff,

       v.

DEPARTMENT OF THE ARMY, *et al.*,
       Defendants.

Civil No. 08-1298 (DRD/BJM)

## REPORT AND RECOMMENDATION

This case presents civil rights claims brought by plaintiff Mayra Meléndez-Morales ("Meléndez") against various defendants including the Secretary of the Army ("Secretary"), under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and various provisions of Puerto Rico law. (Docket No. 7). This court dismissed all claims against defendants in their individual capacities and their unknown spouses and conjugal partnerships. (Docket No. 31). Defendant Secretary moved for summary judgment and dismissal of plaintiff's amended complaint (Docket Nos. 61, 62, 63), plaintiff opposed (Docket Nos. 64, 65), defendant replied (Docket No. 68-1), and plaintiff filed a sur-reply. (Docket No. 67). The presiding district judge referred the matter to me for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1). (Docket No. 71). For the reasons that follow, I recommend that the motion be **granted in part** and **denied in part**.

## I. MOTION TO DISMISS

**A.    Legal Standards**

**1.    Standard for Dismissal Under Rule 12(b)(1)**

Defendant moves to dismiss the amended complaint pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure ("Rule 12(b)(1)") for "lack of jurisdiction over the subject matter." Fed. R. Civ. P. 12(b)(1). Under Rule 12(b)(1), a movant may challenge the court's subject-matter

jurisdiction in either of two ways.  Telemundo of P.R., Inc. v. Union de Periodistas, 2009 WL 3160940, at *2 (D.P.R. Sept. 29, 2009).  First, a movant may raise a factual challenge by controverting the plaintiff's jurisdictional allegations when they are distinct from the case's merits. Valentín v. Hosp. Bella Vista, 254 F.3d 358, 363 (1st Cir. 2001).  The court then addresses "the jurisdictional claim by resolving the [predicate] factual disputes." Id.  Second, under a sufficiency challenge, the court takes the plaintiff's "jurisdictionally-significant facts as true" and "assess[es] whether the plaintiff has propounded an adequate basis for subject-matter jurisdiction." Valentín, 254 F.3d at 363; see Torres-Negrón v. J & N Records, LLC, 504 F.3d 151, 162-63 (1st Cir. 2007). The party asserting jurisdiction bears the burden of showing its existence.  See Skwira v. United States, 344 F.3d 64, 71 (1st Cir. 2003).

If the facts necessary to sustain subject matter jurisdiction do not implicate the merits of the plaintiff's cause of action, then the trial court may weigh the evidence and satisfy itself as to the existence of its power to hear the case.  Garcia v. Copenhaver, Bell & Assocs., M.D.'s, P.A., 104 F.3d 1256, 1261 (11th Cir. 1997), cited in Valentín, 254 F.3d at 363 (internal citation and quotation omitted).  No presumptive truthfulness attaches to plaintiff's allegations; the trial court may evaluate jurisdictional claims for itself.  Id. at 1261, cited in Valentín, 254 F.3d at 363.  In conducting this inquiry, the court enjoys broad authority to order discovery, consider extrinsic evidence, and hold evidentiary hearings.  Valentín, 254 F.3d at 363.  A court may sometimes decide a Rule 12(b)(1) factual challenge without convening an evidentiary hearing; the key considerations are whether the parties have had a full and fair opportunity to present relevant facts and arguments, and whether either party seasonably requested an evidentiary hearing.  Id. at 364.

A federal district court has an independent obligation to review its subject matter jurisdiction over all cases "even in the absence of a challenge from any party." Arbaugh v. Y & H Corp., 546 U.S. 500, 514 (2006); see Fed. R. Civ. P. 12(h)(3).  The court may order dismissal *sua sponte* if it is evident that it lacks the power to decide a case.  See Arbaugh, 546 U.S. at 514.  While prior notice to the plaintiff is ordinarily required, no notice is necessary "[i]f it is crystal clear that the plaintiff

cannot prevail and that amending the complaint would be futile." <u>González-González v. United States</u>, 257 F.3d 31, 37 (1st Cir. 2001).

> **2.     Standard for Dismissal Under Rule 12(b)(6)**

In order to survive a motion to dismiss for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"), a complaint must allege "a plausible entitlement to relief." Fed. R. Civ. P. 12(b)(6); <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544 (2007). However, a court should "accept well-pled factual allegations in the complaint as true and make all reasonable inferences in the plaintiff's favor." <u>Miss. Pub. Employees' Ret. Sys. v. Boston Scientific Corp.</u>, 523 F.3d 75, 85 (1st Cir. 2008). The court may consider documents the authenticity of which are not disputed by the parties, documents central to the plaintiffs' claim, and documents sufficiently referred to in the complaint. <u>Curran v. Cousins</u>, 509 F.3d 36, 44 (1st Cir. 2007) (internal citation omitted).

While a complaint need not contain detailed factual allegations in order to withstand dismissal, a plaintiff's "obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." <u>Twombly</u>, 550 U.S. at 555 (internal citation omitted). The court need not accept as true legal conclusions or "naked assertions devoid of further factual enhancement." <u>Ashcroft v. Iqbal</u>, 556 U.S. ___, 129 S.Ct. 1937, 1949-50 (2009) (citing <u>Twombly</u>, 550 U.S. at 557) (internal alteration omitted); <u>Maldonado v. Fontanes</u>, 568 F.3d 263, 267 (1st Cir. 2009). The complaint must allege enough factual content to nudge a claim across the line from conceivable to plausible. <u>Iqbal</u>, 129 S.Ct. at 1952 (citing <u>Twombly</u>, 550 U.S. at 570). The court's assessment of the pleadings is context-specific, requiring the court "to draw on its judicial experience and common sense." <u>Id.</u> at 1949. The plaintiff must show more than the "sheer possibility that a defendant has acted unlawfully." <u>Id.</u> Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged, but has not shown, that the pleader is entitled to relief. <u>Id.</u> at 1950 (quoting Fed. R. Civ. P. 8(a)(2)).

Meléndez-Morales v. Department of the Army, *et al.*                                             Page 4
Civil No. 08-1298 (DRD/BJM)
**REPORT AND RECOMMENDATION**

**B.      Discussion**

     **1.      Proper Party Defendant**

       Defendant argues that the court should dismiss plaintiff's claims against all defendants other

than the defendant Secretary because they are not proper parties under Title VII.  (Docket No. 62,

p. 2, 19-20).  Plaintiff brings claims against the Department of Defense, the Secretary of Defense,

and various individual defendants in their individual and official capacities.  This court previously

dismissed all claims against the individual defendants in their individual capacities and against their

unknown spouses and conjugal partners.  (Docket 31).

       Title VII clearly requires that "the head of the department, agency, or unit, as appropriate,

shall be the defendant" in a civil action.  Cannon-Atkinson v. Cohen, 95 F. Supp. 2d 70, 76 (D.P.R.

2000) (citing 42 U.S.C. §2000e-16(c)).  Accordingly, John McHugh,[1] in his capacity as Secretary

of the Army, is the only proper party defendant for plaintiff's Title VII claims.  Id. (citing Gardner

v. Gartman, 880 F.2d 797 (4th Cir. 1989); King v. Dalton, 895 F. Supp. 831 (E.D. Va. 1995);

Barhorst v. Marsh, 765 F. Supp. 995 (E.D. Mo. 1991)).  I therefore recommend that plaintiff's Title

VII claims be **dismissed with prejudice** against all remaining defendants save the Secretary in his

official capacity.

     **2.      Puerto Rico Law Claims**

       Defendant argues that plaintiff's Puerto Rico law claims[2] should be dismissed for lack of

subject matter jurisdiction because the United States has not waived its sovereign immunity to suit

with respect to those claims and because Title VII provides the exclusive vehicle for claims of sex

---

     [1] John McHugh became Secretary of the Army on September 21, 2009.  Accordingly, he is
automatically substituted for Pete Geren as the proper defendant pursuant to Federal Rule of Civil
Procedure 25(d).

     [2] Plaintiff brings claims under Law 100 of June 30, 1959, 29 L.P.R.A. § 146 *et seq.* ("Law 100"),
Law 69 of July 6, 1985, 29 L.P.R.A. § 1321 *et seq.* ("Law 69"), and Law 17 of April 22, 1988, 29
L.P.R.A. § 155 *et seq.* ("Law 17").  (Docket No. 7).

discrimination in federal employment.  (Docket No. 62, p. 2, 17-19).  Plaintiff opposes this argument, but does not develop any argument in response.  (Docket No. 64, p. 18).

"Under the long-standing doctrine of sovereign immunity, actions against the United States may only be maintained with its consent." Burgos v. Milton, 709 F.2d 1, 2 (1st Cir. 1983) (citations omitted).  Accordingly, when, as here, "a suit against the Secretary of the Army . . . seeks a money judgment, it is in substance a suit against the United States which can be maintained only if Congress has enacted a statute waiving sovereign immunity." Sibley v. Ball, 924 F.2d 25, 28 (1st Cir. 1991). While Congress has waived the Department of the Army's sovereign immunity with respect to Title VII claims, see 42 U.S.C. § 2000e-16(a), plaintiff has pointed to no source of a similar abrogation of immunity against state-law discrimination actions.  Furthermore, as defendant correctly notes, Title VII provides the exclusive, pre-emptive judicial remedy for claims of discrimination in federal employment. Brown v. Gen. Servs. Admin., 425 U.S. 820, 835 (1976).  Accordingly, I find plaintiff has not met her burden of showing that this court has jurisdiction to entertain her Puerto Rico law claims.  See Skwira, 344 F.3d at 71 (burden of showing that jurisdiction exists lies with party claiming same).  I therefore recommend that plaintiff's claims under Laws 100, 69, and 17 be **dismissed with prejudice** against all defendants.

### 3.        Rule 12(b)(6) Challenge to Title VII Retaliation Claim

In light of the above analysis recommending dismissal of the bulk of plaintiff's claims as a matter of law, only the Title VII claims against the Secretary remain to be considered.  Defendant argues that the amended complaint fails to state a *prima facie* Title VII retaliation claim and thus should be dismissed under Rule 12(b)(6).  (Docket No. 62, p. 21-23).

Title VII prohibits an employer from discharging or otherwise discriminating against any individual on the basis of "race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII also makes it unlawful for private-sector employers "to discriminate against any of his employees . . . because he has made a charge, testified, assisted, or participated in any manner in an

investigation, proceeding, or hearing" under the Act.  42 U.S.C. § 2000e-3(a).  The First Circuit applies this provision to federal-sector employers as well since "Title VII does not contain an express antiretaliation provision applicable to the federal government as employer."  Morales-Vallellanes v. Potter, 605 F.3d 27, 35-6 (1st Cir. 2010) (citations omitted).

To establish a *prima facie* claim of retaliation under Title VII, a plaintiff must show (1) that she engaged in protected conduct, (2) that she suffered an adverse employment action, and (3) that there was a causal connection between the protected conduct and the adverse employment action. Soileau v. Guilford of Me., Inc., 105 F.3d 12, 16 (1st Cir. 1997).  The amended complaint clearly alleges that Meléndez took part in protected conduct, first by complaining to the fitness center's Human Resources Department about the alleged harassment on February 26, 2007, then through filing an informal EEO complaint the following day.  (Docket No. 7, ¶¶ 21-22).

For the second element of the *prima facie* case, Meléndez must show that defendant's conduct following her EEO complaint amounted to an adverse employment action.  An adverse employment action under Title VII's anti-retaliation provision "need not relate to the terms or conditions of employment to give rise to a retaliation claim." Billings v. Town of Grafton, 515 F.3d 39, 54 (1st Cir. 2008).  The plaintiff need only show that "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Morales-Vallellanes, 605 F.3d at 36 (quoting Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53, 64 (2006)).  This objective test employs "the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." Id. (citations and quotations omitted).  Adverse employment actions include, for example, termination, demotion, a material loss of benefits, or significantly reduced material responsibilities, but do not encompass "[m]inor disruptions in the workplace, including petty slights, minor annoyances, and simple lack of good manners."  Id. (citations and quotations omitted).

Meléndez-Morales v. Department of the Army, *et al.*                                    Page 7
Civil No. 08-1298 (DRD/BJM)
**REPORT AND RECOMMENDATION**

Defendant argues that Meléndez's allegations are not sufficiently material to meet this element of the *prima facie* case.  (Docket No. 62, p. 22).  Meléndez alleges that on unspecified dates following the filing of the EEO complaint, Fernández would laugh at and mock her, threateningly look at and bare his teeth at her, cross her path in his car or at work, and mock-accelerate his car when she was crossing the street outside the fitness center as though he would run over her, all of which caused her anxiety and fear for her safety.  The amended complaint alleges that Fernández was not transferred out of the fitness center, away from his supervisory role over plaintiff, until a month after the EEO complaint was filed.  On July 26, 2007, plaintiff complained to the MWR Director about the hostile environment Fernández allegedly continued to create at the workplace.  She requested a job transfer to the Fort Buchanan library, but the Director told her he would transfer her only if she dropped the charges against Fernández.  (Docket No. 7, ¶¶ 23-26).  On September 5, 2007, she requested a restraining order against Fernández, which she alleges he violated by approaching her at work and mocking her.  (Id., ¶¶ 27, 32).

Plaintiff claims that defendants also retaliated against her by arbitrarily adding new tasks to her duties as Recreation Assistant, such as requiring that she be certified as a personal trainer in order to retain her job, a qualification plaintiff alleges was not necessary.  (Id., ¶ 28).  When she complained to fitness center manager Juan Sanfeliz ("Sanfeliz") about this alleged retaliation, Sanfeliz responded that he did not want to know about any retaliation or deal with anything pertaining to her complaint.  (Id., ¶ 29).  Meléndez alleges that defendants further retaliated against her by failing to act to stop the harassment, in violation of internal policies, and by affirmatively condoning and supporting the harassment.  (Id., ¶¶ 28, 35).  Plaintiff alleges that despite several doctor's letters to her supervisors advising them to transfer her, she experienced several panic attacks and ultimately was committed to a psychiatric hospital for eleven days in January 2008.  (Id., ¶¶ 26, 33-34).

Meléndez-Morales v. Department of the Army, *et al.*                                Page 8
Civil No. 08-1298 (DRD/BJM)
**REPORT AND RECOMMENDATION**

Regardless of Fernández's "lack of good manners" or the import of the certification requirement imposed on Meléndez, I agree with plaintiff (see Docket No. 64, p. 16) that the MWR Director's conditioning a job transfer away from the fitness center, where plaintiff was allegedly being harassed, on her dropping her complaint against Fernández clearly constitutes an adverse employment action.  Such conduct is practically the definition case of "dissuad[ing] a reasonable worker from making or supporting a charge of discrimination." Burlington Northern, 548 U.S. at 64.  A reasonable person in plaintiff's position would have considered the job transfer denial to be materially adverse, coming as it did when the investigation of Fernández and his own job transfer had already allegedly proved ineffectual to stop him from continuing to harass Meléndez at the fitness center where she worked.

Having shown that she engaged in protected conduct and suffered an adverse employment action, plaintiff must sufficiently allege a causal connection between the two.  Defendant contends that plaintiff has not shown that her EEO complaint caused the allegedly retaliatory requirement that Meléndez get certified as a personal trainer, since her colleague also had to get that certification (a fact not contained in the amended complaint).  (Docket No. 62, p. 22-23).  However, defendant does not address plaintiff's allegation regarding the job transfer denial.  Plaintiff complained to the EEO on February 27, 2007, and was told on July 26, 2007 to drop that complaint if she wanted to transfer to another job away from Fernández's alleged sexual harassment.  The MWR Director's statement is direct evidence of retaliation, as a "statement[] by a decisionmaker that directly reflect[s] the alleged animus and bear[s] squarely on the contested employment decision." Febres v. Challenger Caribbean Corp., 214 F.3d 57, 60 (1st Cir. 2000) (citations omitted).  Accordingly, Meléndez has alleged a causal connection between her EEO complaint and her employer's refusal to transfer her. I therefore find that Meléndez has alleged facts sufficient to establish a *prima facie* case of retaliation.  Thus, I recommend that the court **deny** defendant's motion to dismiss plaintiff's Title VII retaliation cause of action for failure to state a claim.

Meléndez-Morales v. Department of the Army, *et al.*                                    Page 9
Civil No. 08-1298 (DRD/BJM)
REPORT AND RECOMMENDATION

## II. MOTION FOR SUMMARY JUDGMENT

**A.      Factual Background**

The following material facts, which will be viewed in the light most favorable to plaintiff as the non-moving party, are either undisputed or conclusively supported by the evidentiary record except where otherwise noted:[3]

**1.      Meléndez's Hiring Process**

Meléndez worked at the Morale, Welfare, and Recreation (MWR) Sports and Fitness Center in Fort Buchanan, Puerto Rico as a contract yoga instructor.  (Docket Nos. 63, ¶ 6; 65, ¶ 6).  Before Meléndez became a federal employee, she taught yoga classes as a contract instructor from May through July 2005.  (Id.).

Meléndez testified that she first applied to work for the Army in 2004.  (Docket No. 63-4, p. 33).  In order to apply for a contract position with MWR, Meléndez conducted "special demonstrations" for Roberto Fernández ("Fernández") so that he could determine whether people had interest in her class.  (Docket Nos. 63, ¶ 3; 65, ¶ 3; 65-1, p. 67-8).  Meléndez alleges that, during

---

[3]In determining what facts are supported by the evidentiary record, I have applied Local Rule 56(e):

> Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted.  An assertion of fact set forth in a statement of material facts shall be followed by a citation to the specific page or paragraph of identified record material supporting the assertion.  The court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment.  The court shall have no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts.

The court notes that on numerous occasions both sides erroneously cite or fail to cite the record, misquote text, or fail to provide a copy of the exhibit cited.  Applying Local Rule 56(e) evenly, I have decided to disregard content that lacks citations, cites to pages that are unresponsive to the fact stated, or cites to exhibits not included in the record unless plaintiff admits to defendant's stated fact or the opposing statement directly relates to and corrects a misquote.

these "special demonstrations," Fernández told her that she was his "fantasy girl" and that she was a "dangerous blonde." (Docket Nos. 63-4, p. 67, 71; 65-1, p. 67-8). The "fantasy girl" comments occurred in 2004 and 2005 after plaintiff demonstrated her ability to do the splits. (Docket No. 65, ¶ 3). Meléndez claims that she had a bad feeling about Fernández because of the "fantasy girl" comments; nonetheless, Meléndez followed up her proposal with Fernández after the special demonstrations. (Docket No. 63-4, p. 95, 120). She states that she initiated contact in 2005 and proceeded to call Fernández on his office phone line over a four- to five-month period. (Docket No. 63-4, p. 63, 77).

### 2.   Fernández's Alleged Sexual Harassment

Meléndez contends that after she started as a contract instructor, Fernández asked if she wanted to invite him out to the movies. (Docket Nos. 63, ¶ 7; 63-4, p. 92). Meléndez also claims that during her tenure as a contractor, Fernández asked her for a massage. (Docket Nos. 63, ¶ 8; 63-2, p. 119; 63-4, p. 96). Meléndez admits that she did not tell anyone about these alleged harassing events. (Docket Nos. 63, ¶¶ 7, 8; 63-4, p. 96-8).

During Christmas 2005, Fernández contacted Meléndez at home. (Docket No. 63-4, p. 126). In order to dissuade him from inquiring about her exact home address, plaintiff mentioned her part-time position as a Travel One representative. (Docket Nos. 63, ¶ 17; 63-2, p. 28). Fernández mentioned he was interested in knowing about these deals. (Docket No. 63-4, p. 126). A couple of weeks later, Meléndez called Fernández regarding these deals. (Docket No. 65-5, p. 127).

After Meléndez's contract term ended in July 2005, she applied for a Recreation Assistant position in January 2006. (Docket Nos. 63, ¶ 9; 65, ¶ 9). Meléndez asserts that she applied for the position at the fitness center because she did not think Fernández would continue to sexually harass her because she told him to leave her alone. (Docket Nos. 63-2, p. 124; 65-3, p. 123).

On her January 2006 supplemental employment application for Recreation Assistant,

Meléndez-Morales v. Department of the Army, *et al.*                                      Page 11
Civil No. 08-1298 (DRD/BJM)
REPORT AND RECOMMENDATION

Meléndez listed Fernández as a reference.  (Docket Nos. 63-6, p. 1-2; 65-7, p. 139).  Meléndez was

subsequently hired on March 2, 2006 and employed as a Recreation Assistant at the MWR.  (Docket

Nos. 63, ¶ 12; 65, ¶ 12; 63-7).  Fernández served as Meléndez's immediate supervisor for a month

and a half, from March through April 2006.  (Docket Nos. 63, ¶ 16; 65, ¶ 16).  Meléndez's

employment as a Recreation Assistant was subject to a one-year probation period.  (Docket Nos. 63,

¶ 13; 65, ¶ 13).

In March 2006, Meléndez again mentioned to Fernández that she worked for Travel One and

had discounts with hotels, cruises, and car rentals.  Fernández allegedly stated, "Next time you check

in a hotel, invite me; hotels are better than motels."  (Docket No. 65-6, p. 2 ¶ 5(e)).  Meléndez never

told anyone within the Army about any of Fernández's conduct until February 2007.  (Docket No.

63-4, p. 145-146).  On March 22, 2006, Meléndez attended the Prevention of Office Sexual

Harassment Training, which outlines the substantive aspects of workplace harassment and procedural

requirements for bringing those claims. (Docket Nos. 63, ¶ 18; 65, ¶ 18).

After April 2006, Fernández moved to another managerial position in order to "cross-train"

and acquire skills in the sports office.  (Docket Nos. 63, ¶ 20; 65, ¶ 20; 65-11, p. 183).  Meléndez

alleges that Fernández told her in April 2006 that he was not going to be her boss for the next four

months, so she could harass him.  (Docket Nos. 63, ¶ 19; 65, ¶ 19).  She further alleges that

Fernández told her she had a tremendous body and he needed to see her naked.  (Docket No. 63-4,

p. 153-5).  According to Fernández, once he moved to the sports office, fitness center employees and

the new manager called him on a daily basis to get guidance and advice on different things because

the fitness center manager who replaced him did not have much experience.  (Docket No. 65-11, p.

183-84).  Fernández went to the fitness center two to three times a week after he was moved to the

sports office.  (Docket No. 65-12, p. 187).  The sports office is approximately a ten-minute drive

from the fitness center.  (Docket Nos. 63, ¶ 21; 65, ¶ 21).  According to plaintiff, Fernández still held

the government credit card for fitness center purchases while working at the sports office.  (Docket Nos. 65, ¶ 16; 65-13, p. 338).

After May 1, 2006, Meléndez's immediate supervisor rotated between Sanfeliz (from May 2006 to August 2006) and Mildred Pérez ("Pérez") (from August 2006 to January 2007).  (Docket Nos. 63-3, p. 13, 60, 295; 63-4, p. 155-156; 65, ¶ 22).  Sometime in May 2006, Meléndez mentioned to Fernández that she needed yoga Pilates mats.  Fernández said he would discuss it with her over dinner.  (Docket 65-6, ¶ 5(g)).  Meléndez met Fernández off-duty for dinner at La Ponderosa in San Patricio to discuss those equipment needs.  Once there, plaintiff alleges that Fernández told her they would discuss the equipment needs after they had sex.  (Docket Nos. 65-6, ¶ 5(g); 63-2, p. 38-39; 63-4, p. 163, 168).  Meléndez left the restaurant immediately.  Fernández followed her out of the restaurant and insisted on having sex.  He persisted until she got into her car and left.  (Docket No. 65-6, ¶ 5(g)).  Meléndez did not tell anyone within the Army about this conduct until February 2007.  (Docket No. 63-4, p. 211).

Meléndez alleges that sometime during the summer of 2006, Fernández grabbed her vagina while she bent over to get ice from the machine at the fitness center.  (Docket No. 63-2, p. 48).  Shocked, Meléndez jumped and screamed.  (Docket No. 65-6, p. 2, ¶ 5(h)).  Soon after, a gym customer asked her, "Mayra, what's happening, what's wrong?"  Fernández allegedly replied, "Oh, I just scared her."  (Docket No. 63-4, p. 178).  Later that afternoon, another gym customer, José Antonio Pagán López ("Pagán"), found Meléndez crying and she told him what had occurred.  (Docket No. 65-6, p. 2, ¶ 5(h)).  Plaintiff did not tell anyone within the Army about this conduct until February 2007.  (Docket No. 63-4, p. 211).

According to Nora Blanco ("Blanco"), between June and October 2006, Meléndez repeatedly told Blanco that Fernández needed to be brought back to the fitness center.  (Docket No. 63-3, p. 265-7).  Meléndez testified that on June 13, 2006, she went to Fernández's sports center office at

approximately 7:30 p.m.  (Docket No. 63-4, p. 194-5).  After speaking about work issues until 8

p.m., Meléndez told Fernández that she needed to leave because it was past her bed time.  (Docket

No. 65-6, p. 3 ¶ 5(i)).  As she turned to leave, Meléndez alleges that Fernández grabbed and kissed

her.  Meléndez allegedly told him, "Stop, we can't do this, we work together." (Id.)  Fernández

allegedly responded, "It's going to be our secret; no one is going to know.  Besides, I'm not your

boss now, and remember, you are not permanent yet: you are under probation for a whole year.  You

need to do certain things to become permanent."  (Id.; Docket No. 65-6, p. 4, ¶ 5(i)).  He then

grabbed Meléndez's hand, put it on his penis, and asked her to touch him.  (Docket No. 65-6, p. 3,

¶ 5(i)).  Fernández allegedly stated, "Come on, let's play a little bit, let's have some fun," and said

that it had been awhile since someone had touched him.  (Id.).  Meléndez states that she again told

him to stop.  Fernández allegedly responded, "No one will know, and anyway I am not your boss

right now."  (Id.).  He allegedly told her, "remember, you're not a permanent employee.  You have

to do certain things here to be a permanent employee."  (Docket No. 63-2, p. 34).  Fernández then

allegedly took her to the bathroom, told her to masturbate him while he sat on the toilet, grabbed her

hand, and put it on his penis.  (Docket Nos. 63-4, p. 207; 65-6, p. 3, ¶ 5(i)).  Meléndez states that she

continued to masturbate him until he had an orgasm.  (Docket No. 65-6, p. 3, ¶ 5(i)).  Meléndez

alleges that he then asked her to clean up the semen on the floor.  (Id.).  Meléndez states that she told

Pagán a few days later at the fitness center when he again saw her crying and distraught.  (Id.).

Meléndez did not tell anyone within the Army about this conduct until February 2007.  (Docket No.

63-4, p. 211).

Fernández testified about and produced two unaddressed cards Meléndez allegedly gave him:

an invitation to a "shower party" at Meléndez's home from June or July 2006[4] and a Valentine's Day

---

[4] The unaddressed card, which lists two phone numbers, states, "You are invited to activity,
private shower party, when, weekend, where, my shower, why, to have fun and spend some time
together, cost, free, includes hair shampoo, complete bath, massage, reflexology, chocolates, a bite to eat,

card from February 2007.  (Docket Nos. 63-3, p. 191-2; 63-9; 65-3, p. 190-91).  Meléndez claims

that the "shower card" was intended for someone else, that she brought the card into the fitness

center, and that it and the other card were both stolen from her unlocked locker on two separate

occasions over a six-month period.  (Docket No. 63, ¶ 27 n.2).

    At some point in July 2006, Fernández called Meléndez at home and requested directions to

her home.  (Docket Nos. 63, ¶ 29; 63-4, p. 240).  Meléndez allegedly voluntarily gave Fernández

directions to her home despite Fernández's two alleged assaults in the previous six weeks.  (Docket

Nos. 63-3, p. 188; 63-4, p. 241; 65, ¶ 29).  Meléndez testified that she gave Fernández directions

because she "didn't think it was going to go this far."  (Docket No. 63-2, p. 50, 52).  Fernández

allegedly told Meléndez that it was time for her to pay her dues.  (Docket Nos. 63-4, p. 241; 65-15).

    On August 8, 2006, Fernández alleges that he went to Meléndez's apartment for the "shower

party."  He took a shower with Meléndez, who voluntarily removed her clothing and got into the

shower with him, and then he went to sleep.  Meléndez testified that Fernández told her he was

feeling guilty about their actions, so he got up and left her apartment.  (Docket Nos. 63, ¶¶ 31-33;

63-3, p. 216; 63-4, p. 243).

    Meléndez testified that on August 18, 2006, Fernández asked her to come to his sports office

after work hours, where he demanded that she perform oral sex on him.  (Docket No. 63-4, p. 220-7).

Meléndez further testified that in September 2006, Fernández wanted to see her and suggested that

they shower together.  (Docket No. 63-4, p. 240).  When she declined, she testified that Fernández

forced her to take a shower with him and then allegedly asked her to perform oral sex on him, which

she did.  (Docket No. 63-4, pgs. 240-6).  Meléndez testified that her actions with Fernández were

"voluntary but unwelcomed."  (Docket Nos. 63, ¶ 36 n.5; 63-2, p. 89).  She testified that Fernández

---

natural beverage, fun and laughs, pleasure, some restrictions may apply.  To reserve, please call 1-800-
PRIVATE SHOWER PARTY."  (Docket No. 63-3, p. 191-192; Docket No. 63-9).

told her that she was still a probationary employee and that it "was clear to [her]" that she had to masturbate him and perform oral sex on him or he would fire her.  (Docket No. 63-2, p. 25-6).

Plaintiff alleges that in the week before October 27, 2006, Fernández asked Meléndez to visit him at lunch time.  When she did, he took her to a closet, pulled down her pants, grabbed her breast, and then said, "Okay, go back to work."  (Docket Nos. 63, ¶ 38; 63-2, p. 72).  Meléndez testified that Fernández took no action towards her between the alleged September and October 2006 events.  He saw her on an almost daily basis during these weeks.  (Docket Nos. 63, ¶ 39; 65, ¶ 39).  On December 1, 2006, more than a month after the last alleged harassing event in October, Meléndez alleges that she told Fernández not to call her, touch her, or "try anything," or she would report him. (Docket Nos. 63, ¶ 40; 65, ¶ 40).

### 3.      Alleged Retaliation by Fernández

Meléndez alleges that while Fernández's sexual harassment ended in 2006, he began retaliating against her in 2007.  (Docket No. 65-4, p. 19).  Meléndez testified that in January 2007, Fernández returned to the fitness center, was reinstated as its manager, and became her supervisor again.  (Docket No. 63-5, p. 23).  She testified that Fernández, who had the authority to order her to clean the fitness center's dumbbell racks, retaliated against her in January 2007 by having her lift the heavy dumbbells in order to clean the racks.  (Docket Nos. 63, ¶ 43; 63-5, p. 21, 23).  Meléndez states that she could not physically lift the dumbbells, which weighed up to 100 pounds, and had to request help from fitness center customers.  (Docket No. 65-19, p. 358).  No further retaliatory or harassing events occurred until the first two weeks of February 2007, when Fernández told Meléndez that her butt looked hard and asked her to pull down her pants on several occasions.  (Docket No. 63, ¶¶ 44, 45; 63-2, p. 75-6; 63-5, p. 25-6; 65, ¶¶ 44, 45).

Fernández testified that Meléndez gave him a Valentine's Day card and chocolates on February 14, 2007.  (Docket No. 63-2, p. 192, 195-98).  Meléndez testified that that card, like the "shower party" card, was stolen from her.  (Docket No. 63-2, p. 131).  On February 26, 2007,

Meléndez-Morales v. Department of the Army, *et al.*                                    Page 16
Civil No. 08-1298 (DRD/BJM)
REPORT AND RECOMMENDATION

Meléndez alerted the Civilian Personnel Advisory Center that she was being harassed in the workplace. She was directed to contact the Equal Employment Opportunity office ("EEO"). (Docket Nos. 63, ¶ 47; 63-2, p. 78; 65, ¶ 47). Plaintiff first raised a complaint with the EEO the next day, February 27, 2007. (Docket Nos. 63, ¶ 48). Meléndez testified, without specifying a date, that she "began the investigation" with an EEO counselor, filed an informal EEO complaint, and requested to remain anonymous. (Docket Nos. 63-2, p. 87; 63-5, p. 40). Meléndez testified that she waited to complain until she became a permanent employee, which she felt gave her more job security, because she "knew [she] was going to get fired the minute" she spoke up. (Docket No. 63-2, p. 89). Meléndez alleges that sometime on March 9, 2007, Fernández looked at her "with daggers in his eyes." (Docket No. 63-5, p. 55).

Meléndez complained to her chain of command, and the next day, March 22, 2007, Fernández was reassigned pending investigation of Meléndez's claims. (Docket Nos. 63, ¶¶ 51, 52; 63-3, p. 374-75; 63-5, p. 67; 65, ¶ 52). Fernández remained reassigned outside of the fitness center during the remainder of plaintiff's employment and was subsequently disciplined for his "inappropriate relationship" with Meléndez. (Docket Nos. 63, ¶ 52 n.7; 65, ¶ 52). Meléndez filed a formal EEO complaint on April 2, 2007. (Docket Nos. 63-5, p. 70; 65, ¶ 53). After she filed the formal complaint, Sanfeliz counseled Meléndez for sleeping on the job. (Docket No. 63-5, p. 70, 72). On May 17, 2007, Meléndez claims that Fernández saw her at a picnic area and laughed at her. (Docket Nos. 63-4, p. 74; 65, ¶ 54).

Meléndez claims that at 4 p.m. on June 26, 2007, Fernández chased her through the gym. (Docket Nos. 63, ¶ 56; 65, ¶ 56). Robles testified that he investigated this claim and found no evidence that Fernández was in the fitness center, much less that he chased Meléndez. Robles testified that when he went with Fernández to the fitness center on June 26, 2007 to deliver yoga mats, Fernández remained in the van in the parking lot while Robles delivered the mats in the fitness center. According to Robles, had the event occurred as Meléndez described, someone would have

seen it because 4 p.m. is peak time at the gym.  Robles testified that he spoke with two front desk staff members and they confirmed that Fernández had not been in the fitness center since March 2007.  (Docket Nos. 63, ¶¶ 57, 58; 63-3, p. 327-30, 336, 339, 342-45).

On an unspecified date, Meléndez received a letter she alleges was retaliatory, stating that she would be fired if she did not become certified as a personal trainer.  (Docket Nos. 63, ¶ 59; 63-5, p. 72, 104, 106; 65, ¶ 59).  Meléndez passed the personal trainer exam, was certified, and was not fired.  (Docket No. 63-5, p. 107).  Meléndez testified that a male employee received the same letter informing him that he was required to become a personal trainer.  (Docket No. 63-5, p. 73).

### 4.       Meléndez's Resignation

Meléndez claims she filed a police report about the allegedly stolen "shower card" in August 2007.  (Docket Nos. 63, ¶ 62; 65, ¶ 62).  Meléndez obtained a restraining order against Fernández on September 5, 2007.  (Docket Nos. 63, ¶ 63; 63-5, p. 138; 65, ¶ 63).  Plaintiff testified that she last talked with Fernández on December 5, 2007.  (Docket Nos. 63, ¶ 65; 63-5, p. 148).  Meléndez testified that she waited six months for something to happen with her various complaints against Fernández regarding the protective order and the alleged larceny of the card.  She testified that Fernández continued to harass her and that she was "tired," so when the larceny charges were dismissed due to a clerical error, she quit her job through a resignation letter sent via certified mail on or around February 24, 2008.[5]  (Docket Nos. 63, ¶¶ 64, 66; 63-5, p. 103, 126).

## B.       Legal Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of

---

[5] The exhibit of the resignation letter itself (Docket No. 65-10) will not be considered on summary judgment, as it is inadmissible because unauthenticated.  Local Rule 56(e).

law." Fed. R. Civ. P. 56(c).  A fact is material only if it "might affect the outcome of the suit under the governing law."  "A 'genuine' issue is one that could be resolved in favor of either party, and a 'material fact' is one that has the potential of affecting the outcome of the case." Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-50 (1986)).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [evidence] . . . which it believes demonstrate the absence of a genuine issue of material fact." Crawford-El v. Britton, 523 U.S. 574, 600 n.22 (1998) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  Once this threshold is met, the burden shifts to the nonmoving party, who "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Instead, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial" and support such facts with "affidavits . . . made on personal knowledge . . . set[ting] forth such facts as would be admissible in evidence." Fed. R. Civ. P. 56(e).  While the court draws inferences and evaluates facts "in the light most favorable to the nonmoving party," Leary v. Dalton, 58 F.3d 748, 751 (1st Cir. 1995), summary judgment is still appropriate where the nonmoving party rests entirely on conclusory allegations, improbable inferences, unsupported speculation, or wholesale denials with regard to any essential element of the claim. Fed. R. Civ. P. 56(e); Carroll v. Xerox Corp., 294 F.3d 231, 236-37 (1st Cir. 2002); Libertad v. Welch, 53 F.3d 428, 435 (1st Cir. 1995); Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).

## C.    Analysis

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such

individual's race, color, religion, sex, or national origin." 42 U.S.C. 2000-e-2(a)(1). Title VII was

enacted to eradicate from the workplace any type of discrimination on the basis of sex or national

origin. But "Title VII is neither a civility code nor a general antiharassment code. It requires that

the level of incivility or harassment amount to either tangible or a constructive employment action.

In addition, the alleged harassment and employment action must be causally related." Crespo v.

Schering-Plough del Caribe, Inc., 354 F.3d 34, 37 (1st Cir. 2003). Sexual harassment which is

sufficiently severe or pervasive as to alter the conditions of the victim's employment creates an

abusive working environment and violates Title VII. Pa. State Police v. Suders, 542 U.S. 129, 133

(2004); Faragher v. City of Boca Raton, 524 U.S. 775, 786 (1998). Plaintiff alleges that defendants

violated Title VII through discrimination and harassment based on her gender, all of which resulted

in constructive discharge. Defendants move for summary judgment, arguing that the record lacks

evidence to support plaintiff's claims.

### 1.       Hostile Work Environment

Defendant seeks summary judgment on plaintiff's hostile work environment claim, arguing

that Meléndez cannot establish defendant's vicarious liability for Fernández's actions. (Docket No.

62, p. 3, 10-14). In order to establish a hostile work environment, plaintiff must show that the

"workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently

severe or pervasive to alter the conditions of the victim's employment and create an abusive working

environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 20-23 (1993) (internal citation and

quotation omitted). To establish a *prima facie* case, a plaintiff must show 1) that she is a member

of a protected class; 2) that she was subjected to unwelcome harassment; 3) that the harassment was

based on her membership of the protected class; 4) that the harassment was so severe or pervasive

as to alter the conditions of her employment and create an abusive work environment; 5) that the

objectionable conduct was both objectively and subjectively offensive, such that a reasonable person

would find it hostile or abusive and the victim in fact perceived it to be so; and 6) that some basis

Meléndez-Morales v. Department of the Army, *et al.*                              Page 20
Civil No. 08-1298 (DRD/BJM)
REPORT AND RECOMMENDATION

for employer liability has been established.  Faragher, 524 U.S. at 787-89; Torres-Negron v. Merck & Co., Inc., 488 F.3d 34, 39-40 (1st Cir. 2007) (citations omitted).

Defendant concedes for the purposes of the summary judgment motion that Meléndez can show the first five elements of the *prima facie* case, but maintains that summary judgment must be granted because plaintiff cannot establish defendant's liability for Fernández's conduct under the last *prima facie* prong.  (Docket No. 62, p. 10-13).  An employer's liability for a hostile work environment claim depends on the harasser's employment status relative to the plaintiff's: the employer may be found vicariously liable if the plaintiff's supervisor created a hostile work environment, but where the harasser is a coworker, the employer is liable only if it was negligent either in discovering or remedying the harassment, meaning it "knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action." Forrest v. Brinker Int'l Payroll Co., LP, 511 F.3d 225, 230-31 (1st Cir. 2007) (citations and quotations omitted); Torres-Negron, 488 F.3d at 40 (citing Faragher, 524 U.S. at 807; Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 764-65 (1998)); Crowley v. L.L. Bean, Inc., 303 F.3d 387, 401 (1st Cir. 2002)).

Where the harasser is the plaintiff's supervisor, an employer may raise the so-called Faragher-Ellerth affirmative defense, under which the employer may avoid liability if it shows that (1) it exercised reasonable care (a) to prevent harassment and (b) to eliminate it when it might occur, and (2) the employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.  Faragher, 524 U.S. at 805; Ellerth, 524 U.S. at 765; Torres-Negron, 488 F.3d at 40 n.5.  The employer bears the burden of proof on both prongs of the defense.  Reed v. MBNA Mktg. Sys., Inc., 333 F.3d 27, 34 (1st Cir. 2003). The defense is available to the employer only if the employee did not experience a "tangible employment action," which typically means "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."

Meléndez-Morales v. Department of the Army, *et al.*                    Page 21
Civil No. 08-1298 (DRD/BJM)
REPORT AND RECOMMENDATION

Ellerth, 524 U.S. at 761, 766.[6]

     During the time period covering the alleged harassment, Fernández was undisputedly plaintiff's supervisor from March to April 2006 and from January to March 2007.  He was assigned to the sports center from May to December 2006, then was reassigned outside the fitness center starting in late March 2007 while plaintiff's harassment complaint was investigated.  Plaintiff argues that while Fernández was "not properly Plaintiff's supervisor" during the interim period, he should still be considered effectively to have been her supervisor since, after his transfer, Fernández gave advice to the fitness center's new manager and employees and retained the government credit card for fitness center purchases.  (Docket No. 64, p. 15).  Moreover, Fernández frequently visited the fitness center even after his reassignment, and it was he to whom plaintiff went in May 2006, after his transfer, when she needed to request yoga Pilates mats for work.  Plaintiff also testified that it did not matter that Fernández was working in the sports center because "[h]e was still running the show, and he would be coming back" in a few months to run the fitness center again, before plaintiff's probationary period concluded in March 2007.  (Docket No. 63-2, p. 25-6).

     I find that this evidence is sufficient to create a material fact question as to whether Fernández was effectively still plaintiff's supervisor between May and December 2006.  This issue is material because it has the power to affect the outcome of the case.  Calero-Cerezo, 355 F.3d at 19.  If Fernández was not plaintiff's supervisor during that time period, defendant's liability must be evaluated under the standard for harassment by a coworker.  Under this standard, defendant would not be liable to plaintiff since defendant neither knew nor should have known of the harassment.  Forrest, 511 F.3d at 230-31.  Plaintiff did not complain until February 2007, after Fernández's reinstatement as her supervisor, and there is no evidence that any other of defendant's employees

---

     [6] The Faragher-Ellerth defense is available in constructive discharge cases, Suders, 542 U.S. at 148-49, but, as will be discussed *infra*, plaintiff was not constructively discharged from her job, so there is no tangible employment action in that regard.  Plaintiff does not challenge the defense's availability to defendant.

knew of the harassment; at most, plaintiff told one or two fitness center patrons about certain incidents.  Absent any basis for imputing knowledge to defendant, defendant cannot be held accountable for Fernández's sexually harassing acts as Meléndez's coworker, and Meléndez's hostile work environment claim would fail.

If, however, the court treats Fernández as plaintiff's supervisor during the interim period when he was assigned to the sports center, triable fact questions at both prongs of the <u>Faragher</u>-<u>Ellerth</u> defense preclude summary judgment on the hostile work environment claim.  Plaintiff does not dispute that defendant has met the first aspect of the first <u>Faragher</u>-<u>Ellerth</u> prong (taking reasonable care to prevent harassment): defendant had an established policy against discrimination and harassment, and Meléndez was trained about it in March 2006, shortly after she was hired full-time.  However, plaintiff argues that under the second aspect of the first prong, a fact question exists as to whether defendant took reasonable care to enforce that policy and eliminate the harassment plaintiff experienced.  Plaintiff claims that defendant took no corrective action or remedial measures and did not conduct an investigation despite her EEO complaint.  (Docket No. 64, p. 13, 15).

As noted, defendant did not know about the harassment prior to February 2007; therefore, its failure to act does not foreclose the <u>Faragher</u>-<u>Ellerth</u> defense.  <u>See</u> <u>Chaloult v. Interstate Brands Corp.</u>, 540 F.3d 64, 76-7 (1st Cir. 2008) (affirming summary judgment for employer where "the company was deprived of the opportunity to take remedial action" because plaintiff did not allege sexual harassment until she filed suit well after leaving her job).  Furthermore, plaintiff's claim in her opposition motion that defendant did not investigate or act on her complaint is clearly without merit.  Plaintiff admits (Docket No. 65, ¶¶ 47, 52) that less than a month after she complained to the Civilian Personnel Advisory Center about the harassment, Fernández was reassigned outside the fitness center pending an investigation of Meléndez's claims, that he stayed reassigned for the remainder of plaintiff's employment, and that he was subsequently disciplined.  (Docket No. 63, ¶¶ 47, 52).

However, this does not necessarily resolve the question of whether defendant exercised reasonable care to promptly correct Fernández's harassing behavior.  As plaintiff repeatedly notes, it took nearly a month from her initial complaint for Fernández to be reassigned.  Moreover, it is not clear when or how Fernández was disciplined.  Additionally, plaintiff claims the work environment remained hostile enough even after Fernández's reassignment that she felt she had no choice but to resign in February 2008, a year after she first complained.  (Docket Nos. 65, ¶ 66).  While "summary judgment for the employer is still possible so long as raw facts are undisputed or assumed in favor of the plaintiff . . . , the judgment call as to reasonableness is itself a jury issue unless no reasonable jury could decide it in the plaintiff's favor."  Reed, 333 F.3d at 34 (citation omitted).  Here, a jury could reasonably find for Meléndez that defendant did not act reasonably and promptly in taking nearly a month to reassign a supervisor accused of sexually harassing and indeed assaulting one of his employees.  Accordingly, I agree with plaintiff that defendant has not met its burden under the second aspect of the first Faragher-Ellerth prong of showing that it exercised reasonable care to promptly eliminate the sexual harassment of Meléndez.

While the question of the employer's conduct's reasonableness is alone sufficient to preclude summary judgment on plaintiff's hostile work environment claim, the second Faragher-Ellerth prong nevertheless merits consideration.  "Reasonable effort is required on both sides" of the employer-employee relationship, so in normal circumstances, the employee must go to the effort of putting the company on notice if she wants to impose vicarious liability on the employer and collect damages under Title VII.  Chaloult, 540 F.3d at 74 (citations omitted).  The employer normally can meet its burden under the second element by demonstrating that an employee unreasonably failed to fulfill her corresponding obligation of reasonable care to avoid harm.  Faragher, 524 U.S. at 807-08; Ellerth, 524 U.S. at 764-65.

Plaintiff admits that she was given an EEO training regarding sexual discrimination and harassment on March 22, 2006.  (Docket Nos. 63, ¶ 18; 64, p. 14; 65, ¶ 18).  Fernández allegedly

made harassing comments to plaintiff while she was a contractor and again in March 2006 (after she had been hired and placed under Fernández's supervision), sexually assaulted her on several occasions between roughly June and October 2006, and made further harassing comments to her in early February 2007. She first reported Fernández's harassment in late February 2007. As defendant notes, Meléndez testified that Fernández told her she had to perform the alleged sex acts during her one-year probationary employment period or else he would fire her. (Docket No. 63-2, p. 25). She also testified that she "knew [she] was going to get fired the minute" she spoke up about the harassment. (Docket No. 63-2, p. 89). Plaintiff claims, without citing to the record, that she could not utilize her anti-harassment training because the supervisor to whom she would have to report the harassment (*i.e.*, pursuant to the complaint mechanism) was himself the harasser. Plaintiff argues that Fernández's threat to her job made it reasonable for her not to complain until her probationary period was up, and that the question of reasonableness is one for a jury. (Docket No. 64, p. 14).

Defendant, for its part, argues that plaintiff's allegations of fear of termination are unsubstantiated and do not render her delay reasonable. (Docket No. 62, p. 12-13). While there are threats by Fernández to fire her for refusing his sexual advances while she was still probationary, the evidence does not show direct threats by Fernández to fire her for *complaining*. Plaintiff's only evidence that she would be terminated if she complained is her own allegation that she "knew" she would be fired if she "spoke up" while she was still a probationary employee, so she waited to complain until February 2007, when her probationary period was ending. That is, plaintiff essentially claims her delay was reasonable because she thought she could and would lose her job for complaining while still probationary, but that once she went permanent, her job would be secure even if she complained.

There is, therefore, some merit to defendant's argument that plaintiff's fear of retaliation was unsubstantiated. Fernández did not directly threaten retaliation for complaining. "[G]eneral statements by a supervisor that a complaint will be futile or will get the employee in trouble cannot

Meléndez-Morales v. Department of the Army, *et al.*                                Page 25
Civil No. 08-1298 (DRD/BJM)
REPORT AND RECOMMENDATION

be an automatic excuse for failing to use the complaint mechanism.  Claims of futility or adverse consequences have to be credible."  Reed, 333 F.3d at 36 (citation and quotation omitted).  "The complaint mechanism, after all, can be used to address threats of retaliation as well as harassment . . . .  But where there is a truly credible threat of retaliation that the complaint mechanism will not prevent, the employee's position is more hazardous and inaction more easily explained."  Id.  Failure to report an actual physical sexual assault presents a much harder question of reasonableness than failure to report low-level remarks.  Id. at 36-7.

These facts present a very close question.  Fernández allegedly told plaintiff on multiple occasions that her position as a probationary employee was tenuous and that she could go permanent only by submitting to his sexual advances, or else he would fire her.  I find that a reasonable jury could also find Meléndez reasonably believed that she would not only be denied permanent hire, but would also be terminated, if she complained about the alleged sexual assaults (complaint being, after all, a form of refusing to submit).  The second Faragher-Ellerth prong "creates a loophole for false or overstated claims of threat . . .  But juries are supposed to be good at detecting false claims and at evaluating reasonable behavior in human situations."  Reed, 333 F.3d at 37.  Accordingly, I find that the question of whether it was reasonable for plaintiff to wait to go permanent before complaining is one best left to a jury.

Moreover, unlike in Reed, there is very little evidence about the precise details of defendant's anti-harassment policy and complaint mechanism, aside from plaintiff's allegation that her supervisor was the one to whom she was supposed to report harassment.  Plaintiff was trained to complain if she was harassed, but there is no evidence that defendant's policy encompassed, or that plaintiff was trained about, what to do if she was threatened with retaliation for complaining about harassment.  It is not clear from the limited evidence available that it would be unreasonable for Meléndez to think that a probationary employee could be terminated for reporting illegal harassment. The evidentiary picture will become much clearer at trial.

Since the issue of whether Fernández was Meléndez's supervisor from June to December 2006 is outcome-determinative given the triable fact questions as to the reasonableness of both plaintiff's and defendant's actions under the <u>Faragher</u>-<u>Ellerth</u> analysis, I recommend that the court **deny** summary judgment to defendant on plaintiff's Title VII hostile work environment claim.

### 2.        Constructive Discharge

Next, defendant argues that summary judgment is appropriate as to plaintiff's constructive discharge claim under Title VII.  (Docket No. 62, p. 3, 6-9).  To prove constructive discharge, [an employee] must show that the "working conditions imposed by the employer had become so onerous, abusive, or unpleasant that a reasonable person in the employee's position would have felt compelled to resign." <u>Vieques Air Link, Inc. v. U.S. Dep't of Labor</u>, 437 F.3d 102, 108 (1st Cir. 2006) (citing <u>Mercado-Alicea v. P.R. Tourism Co.</u>, 396 F.3d 46, 52 (1st Cir. 2005); <u>Suarez v. Pueblo Int'l, Inc.</u>, 229 F.3d 49, 54 (1st Cir. 2000)).  Thus, under this standard, an employee cannot be "unreasonably sensitive to a change in job responsibilities." <u>Serrano-Cruz v. DFI P.R., Inc.</u>, 109 F.3d 23, 26 (1st Cir. 1997)**;** <u>Calhoun v. Acme Cleveland Corp.</u>, 798 F.2d 559, 561 (1st Cir. 1986).  A "limited blow to one's pride or prestige does not provide reason enough to resign"; what is required is "[a] more drastic reduction in the quality of working conditions," measured objectively. <u>Alicea-Rosado v. Garcia-Santiago</u>, 562 F.2d 114, 119-20 (1st Cir. 1977).  Thus, an employee's subjective perceptions cannot govern a claim of constructive dismissal. <u>Marrero v. Goya of P.R., Inc.</u>, 304 F.3d 7, 28 (1st Cir. 2002) (quoting <u>Calhoun</u>, 798 F.2d at 561).

Where, as here, a plaintiff alleges the compound claim of hostile-environment constructive discharge, she must show working conditions so intolerable that a reasonable person would have felt compelled to resign. <u>Suders</u>, 542 U.S. at 148 (citing <u>Breeding v. Arthur J. Gallagher & Co.</u>, 164 F.3d 1151, 1160 (8th Cir.1999); <u>Perry v. Harris Chernin, Inc.</u>, 126 F.3d 1010, 1015 (7th Cir. 1997)). "[T]he question is not whether working conditions at the facility were difficult or unpleasant," but rather, an employee "must show that, *at the time of his resignation*, his employer did not allow him

the opportunity to make a free choice regarding his employment relationship." <u>Torrech-Hernandez</u>
<u>v. GE</u>, 519 F.3d 41, 50 (1st Cir. 2008) (citing <u>Exum v. U.S. Olympic Comm.</u>, 389 F.3d 1130, 1135
(10th Cir. 2004)) (emphasis added). Thus, in order for a resignation to constitute a constructive
discharge, it effectively must be void of choice or free will. <u>Id.</u> (citations omitted).  Importantly, the
resignation must not come too late after the offensive conduct.  "If a plaintiff does not resign within
a reasonable time period after the alleged harassment, he was not constructively discharged."
<u>Landrau-Romero v. Banco Popular de P.R.</u>, 212 F.3d 607, 613 (1st Cir. 2000) (citing <u>Smith v. Bath</u>
<u>Iron Works Corp.</u>, 943 F.2d 164, 167 (1st Cir. 1991) (no constructive discharge where plaintiff quit
six months after last reported incident of sexual harassment)).

Here, defendant argues that plaintiff has not shown that at the time of her resignation in
February 2008, conditions at work were intolerable enough to render her resignation involuntary.
(Docket No. 62, p. 8-9).  As defendant notes, Fernández had been reassigned away from his
supervisory role over plaintiff at the fitness center eleven months prior to her resignation.  Plaintiff
testified that she quit in February 2008 because Fernández kept harassing her, her larceny charge
against him got dismissed after six months of waiting, and she was tired.  However, there is no
competent evidence of any particular harassing conduct by Fernández after June 26, 2007, on which
date Fernández allegedly chased Meléndez through the gym.  The last undisputed incident prior to
that was in May 2007, when Fernández allegedly laughed at plaintiff when he spotted her at a picnic
area.  Meléndez's general allegation that Fernández was still harassing her as of the time of her
resignation is not enough to show that her work environment was so intolerable that she had no
choice but to quit when she did.  Therefore, I agree with defendant that plaintiff has not shown that
she was constructively discharged through hostile work environment.  Accordingly, I recommend
that the court **grant** summary judgment for defendant on plaintiff's constructive discharge claim.

Meléndez-Morales v. Department of the Army, *et al.*                                       Page 28
Civil No. 08-1298 (DRD/BJM)
REPORT AND RECOMMENDATION

### 3.    *Quid Pro Quo*

Plaintiff claims in her motion opposing summary judgment that the amended complaint states
a Title VII cause of action for *quid pro quo* sexual harassment as well as for hostile work
environment. (Docket No. 64, p. 2).  Although the amended complaint does not specifically mention
the term *quid pro quo*, the facts alleged therein and the invocation of Title VII are enough to make
out such a claim. (Docket No. 7, ¶¶ 17, 18, 21, 38).  In *quid pro quo* sexual harassment, a supervisor
conditions a grant of an economic or other job benefit upon receipt of sexual favors from a
subordinate, or punishes the subordinate for refusing to comply.  Lipsett v. Univ. of P.R., 864 F.2d
881 (1st Cir. 1988).  *Quid pro quo* cases are roughly distinguished from hostile work environment
cases through the distinction "between cases in which threats [to take tangible adverse employment
action against the harassed plaintiff] are carried out and those where they are not or are absent
altogether." Ellerth, 524 U.S. at 751; Forrest, 511 F.3d at 228 n.2.  The plaintiff must establish that
his or her response to unwelcome sexual advances affected tangible aspects of his or her
compensation, terms, conditions, or privileges of employment.  In rebuttal, the defendant may show
that the offending conduct either did not occur or that it did not affect a tangible aspect of the
plaintiff's employment. Garcia v. V. Suarez & Co., 288 F. Supp. 2d 148, 158 (D.P.R.. 2003)
(Dominguez, J.) (citations and quotation omitted).

Here, although defendant's motion does not address plaintiff's *quid pro quo* claim at all
(Docket No. 62), I find that the claim survives scrutiny under either the Rule 12(b)(6) or Rule 56
standard.  Both the amended complaint (Docket No. 7, ¶¶ 17, 18, 21) and the facts available on
summary judgment allege that while Meléndez was still a probationary employee, Fernández made
unwelcomed sexual advances towards her and conditioned her attainment of permanent employment
on performing sexual favors, threatening her with termination if she did not comply. Meléndez

Meléndez-Morales v. Department of the Army, *et al.*                                    Page 29
Civil No. 08-1298 (DRD/BJM)
REPORT AND RECOMMENDATION

submitted to Fernández's demands, Fernández never followed through on his threats of terminating

plaintiff, and Meléndez went permanent after her one-year probationary term was up.

While these facts do not establish the common *quid pro quo* fact pattern of a supervisor

taking an adverse employment action against an employee for rebuffing his advances,[7] I find that

they are sufficient, under the Rule 12(b)(6) standard, to establish that plaintiff retained her job

because she complied with Fernández's unwelcomed sexual advances.  Alternatively, on the Rule

56 standard, summary judgment is foreclosed by the aforementioned triable fact issue of whether

Fernández was plaintiff's supervisor at the time of the alleged sex acts – all of which allegedly

occurred during the months in 2006 when Fernández was assigned to the sports center.  Furthermore,

since defendant does not address the *quid pro quo* claim at all, it has not informed the district court

why no triable fact issue exists respecting that claim.  Crawford-El, 523 U.S. at 600 n.22.  Therefore,

I recommend the court **deny** defendant's motion with respect to plaintiff's Title VII *quid pro quo*

sexual harassment claim.

## CONCLUSION

For the reasons stated above, I recommend that defendant's motion to dismiss and motion

for summary judgment (Docket Nos. 61, 62) be **granted in part** and **denied in part**.  Specifically,

I recommend that the court **dismiss with prejudice** (1) all Puerto Rico law claims and (2) plaintiff's

Title VII claims against all defendants except the Secretary of the Army in his official capacity.  With

respect to defendant Secretary, I recommend that the court **deny** defendant's motion with respect to

plaintiff's Title VII retaliation, hostile work environment, and *quid pro quo* sexual harassment claims

and **grant** summary judgment for defendant on the Title VII constructive discharge claim.

---

[7] Although Fernández allegedly engaged in retaliatory acts, they were allegedly in response to
plaintiff's complaining about, not resisting, his harassment.

Meléndez-Morales v. Department of the Army, *et al.*                                    Page 30
Civil No. 08-1298 (DRD/BJM)
REPORT AND RECOMMENDATION

     The parties have **five (5) business days** to file any objections to this report and recommendation.  Furthermore, the court has **set aside** the three-day term provided by Local Rule 5(e).  (Docket No. 71).   See Local Rule 72(d); 28 U.S.C. § 636(b)(1).  Failure to file same within the specified time waives the right to appeal this order.  Henley Drilling Co. v. McGee, 36 F.3d 143, 150-151 (1st Cir. 1994); United States v. Valencia, 792 F.2d 4, 6 (1st Cir. 1986); see also Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985, 991 (1st Cir. 1988).

     **IT IS SO RECOMMENDED.**

     In San Juan, Puerto Rico, this 28th day of January, 2011.


                                 *S/Bruce J. McGiverin*
                                 BRUCE J. McGIVERIN
                                 United States Magistrate Judge